**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-15**

ROGER M. BLAKENEY,

             Petitioner – Appellant,

      v.

GERALD J. BRANKER, Warden, Central Prison, Raleigh, North
Carolina,

             Respondent – Appellee.

Appeal from the United States District Court for the Western
District of North Carolina, at Charlotte.  Richard L. Voorhees,
District Judge.  (3:05-cv-00010-RLV)

Argued:  September 23, 2008          Decided:  March 5, 2009

Before MICHAEL, KING, and GREGORY, Circuit Judges.

Affirmed by unpublished opinion.  Judge King wrote the opinion,
in which Judge Michael joined.  Judge Gregory wrote a separate
opinion concurring in part and dissenting in part.

**ARGUED**:   Burton  Craige,  PATTERSON  HARKAVY,  L.L.P.,  Raleigh,
North  Carolina,  for  Appellant.   Edwin  William  Welch,  NORTH
CAROLINA  DEPARTMENT  OF  JUSTICE,  Raleigh,  North  Carolina,  for
Appellee.  **ON BRIEF:** Jeffrey P. Bloom, Columbia, South Carolina,
for  Appellant.   Roy  Cooper,  North  Carolina  Attorney  General,
Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

KING, Circuit Judge:

Roger M. Blakeney ("Blakeney" or "defendant") appeals the district court's denial of his federal habeas corpus petition, by which he seeks to have his North Carolina convictions and death sentence vacated for alleged constitutional violations. Blakeney contends that the district court erred in three respects: (1) in denying him relief on the claim that his trial counsel rendered ineffective assistance during sentencing proceedings; (2) in denying him relief on the claim that the prosecution withheld exculpatory evidence; and (3) by rejecting his request for an evidentiary hearing on the claim that his trial counsel was ineffective in failing to adequately challenge the racial composition of the jury. As explained below, we are constrained to affirm.

I.

A.

The pertinent details of Blakeney's state trial and the factual predicate for his prosecution were outlined by the Supreme Court of North Carolina on direct appeal, as follows:

> On 13 May 1996 defendant Roger McKinley Blakeney (defendant) was indicted for the first-degree murder of Callie Washington Huntley (the victim). Defendant was also indicted for arson, common law robbery, felonious breaking and entering, felonious larceny, and felonious possession of stolen goods. Defendant was tried capitally at the 25 August 1997 Criminal

2

Session of Superior Court, Union County. At the close of the evidence, the state voluntarily dismissed the larceny charge. In addition, the charge of felonious possession of stolen goods was not submitted to the jury. The jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury also found defendant guilty of first-degree arson, common law robbery, and felonious breaking and entering. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. The trial court also entered judgments sentencing defendant to consecutive terms of imprisonment for the remaining convictions.

The state presented evidence at trial which is summarized as follows: On 15 April 1996, between the hours of 10:00 a.m. and 12:00 noon, defendant, age thirty-three, opened and crawled through a back window in his mother's home for the purpose of stealing something of value that he could sell. Defendant stole three of his mother's rings, a brown leather pouch, approximately $4.00 in change, a small herringbone chain, and his mother's savings account deposit book. Defendant then telephoned his wife and told her he would be home in a few minutes.

After defendant finished speaking with his wife, the victim, age seventy-six, drove behind the house. The victim had lived with defendant's mother for over twenty years. Defendant hid in a small room behind the refrigerator as the victim entered the residence. According to defendant's confession, which was admitted into evidence at trial, defendant entered the kitchen, and the two began arguing. Defendant told authorities that he turned to leave, but the victim grabbed him. Defendant charged at the victim, grabbed and wrestled a .22-caliber revolver out of the victim's hand, and hit the victim in the back of the head with the butt of the gun. The victim fell facedown on the kitchen floor and started bleeding. According to defendant, after some additional period of physical struggle, a metal can of kerosene was accidentally spilled. Defendant also claimed that a cigarette he was smoking fell out of his mouth at some

3

time during the struggle. According to defendant, at some point, he pulled the victim off the floor, sat him in a chair, and wrapped an electrical cord around his hands and legs. Defendant then removed $78.00 from the victim's wallet, exited the residence, and departed the area in defendant's vehicle.

Terry Lee Bivens (Bivens), defendant's longstanding friend, worked at a nearby business and observed defendant departing his mother's residence on the day in question. Bivens recognized defendant's vehicle. Seconds later, Bivens noticed smoke coming from the residence. Bivens and several other witnesses looked on as the house began to burn.

Firefighters arrived at the scene and discovered the victim's wire-bound body as they fought the fire. Agent Van Worth Shaw, Jr. (Agent Shaw), an arson investigator for the State Bureau of Investigation (SBI), determined that the fire had two distinct points of origin and was caused by the use of a flammable liquid. In contrast to defendant's statement, all accidental causes were eliminated during the investigation, and Agent Shaw opined that the fire was intentionally set. The investigation revealed traces of kerosene on samples taken from the couch in the den and on the victim's clothing.

Dr. Robert Thompson, a forensic pathologist with the Office of the Chief Medical Examiner, performed an autopsy on the victim's body. The autopsy revealed that seventy-five percent of the victim's skin was charred. Dr. Thompson also observed that the victim had received a wound to the back and a wound to the left temporal area of the head, which resulted in injury to the brain. Dr. Thompson opined that the victim was conscious for approximately three to five minutes after the fire started, that the victim died within approximately ten minutes, and that the cause of death was carbon monoxide poisoning produced by the fire.

On 16 April 1996 law enforcement officers located defendant at a friend's residence, sitting in the passenger seat of his vehicle. Defendant consented to a search of his vehicle, where the officers found his mother's stolen jewelry, leather pouch, and savings

4

deposit book in the glove compartment. The authorities later recovered the .22-caliber revolver that defendant had taken from the victim. Defendant had exchanged the gun for a loan. The investigation also revealed that bloodstains found on defendant's clothing were consistent with the victim's blood.

Defendant did not present evidence during the guilt-innocence phase of trial.

State v. Blakeney, 531 S.E.2d 799, 806-08 (N.C. 2000).[1] Specific to the trial's sentencing phase, the state supreme court observed that

the state presented evidence of, and defendant stipulated to, one conviction for robbery with a dangerous weapon. The state's evidence tended to show that, in 1989, defendant robbed a grocery store and struck the store owner in the back of the head with a

---

[1] The state supreme court provided further details of the murder and its aftermath, as follows:

defendant telephoned his wife from his mother's residence, before the victim arrived, and informed her he would be home "in a few minutes." The record reveals, however, that defendant did not return home as planned. Rather, defendant ran from the scene of the crime and departed the area in his vehicle. One of defendant's longstanding friends waved at him, but defendant did not respond. After departing the area, defendant drove to "[Emanuel Blackman's] shack out in the country," where he traded the victim's gun for cocaine and twenty dollars in cash. Defendant then continued to drive through the country, stopping in Pageland, South Carolina, where he traded more stolen items for drugs. Rather than return home, as originally intended, defendant then went to Kenneth Funderburk's house and remained there overnight. Law enforcement officers apprehended defendant at this residence the next afternoon.

Blakeney, 531 S.E.2d at 819 (alteration in original).

gun.   Evidence at trial also indicated that defendant had a history of drug abuse.

* * *

[In considering the death penalty on the first-degree murder conviction,] [t]he jury found four aggravating circumstances:   (1) defendant had been previously convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed while defendant was engaged in the commission of first-degree arson, N.C.G.S. § 15A-2000(e)(5);  (3)  the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (4) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

Of the eight mitigating circumstances submitted, one or more jurors found the following:  (1) defendant grew up in very unfortunate and difficult circumstances in that he grew up in a physical and psychological environment which significantly retarded the proper development of his character and functional abilities; (2) defendant's father was absent from the home since defendant was two or three years old; and (3) defendant's mother was in and out of the home and involved in an alcoholic and verbally and sometimes physically abusive relationship with Mr. Huntley, the victim here, which the defendant witnessed.

Id. at 821, 824-25.   On July 13, 2000, in his direct appeal, the state supreme court affirmed Blakeney's convictions and death sentence.   See id. at 826.   Thereafter, on January 16, 2001, the Supreme Court of the United States denied Blakeney's petition for a writ of certiorari.   See Blakeney v. North Carolina, 121 S. Ct. 868 (2001).

B.

Blakeney filed a motion for appropriate relief (the "MAR") in the state superior court (the "MAR court") on November 16,

6

2001, and amended the MAR on February 5, 2003, raising a total of seven issues. By its Order of June 5, 2003, the MAR court, in relevant part, deferred ruling on Blakeney's claims that his trial counsel had rendered ineffective assistance at sentencing (the "ineffective assistance/sentencing claim") and that the prosecution had withheld various exculpatory evidence (the "original exculpatory evidence claim"). See State v. Blakeney, No. 96 CRS 4774-4777 (N.C. Super. Ct. June 5, 2003) (the "First MAR Order").[2] Also by the First MAR Order, the court rejected as procedurally barred the claim that Blakeney, who is African-American, had been unconstitutionally tried by an all-white jury (the "substantive jury composition claim").

In the meantime, on May 9, 2003, Blakeney had amended his MAR for a second time, raising the claim that his trial counsel had rendered ineffective assistance by failing to object to the racial composition of the jury (the "ineffective assistance/jury composition claim"). By its Order of November 12, 2003, the MAR court rejected the ineffective assistance/jury composition claim as both procedurally barred and without substantive merit. See

---

[2] The First MAR Order is found at J.A. 847-933. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

7

State v. Blakeney, No. 96 CRS 4774-4777 (N.C. Super. Ct. Nov. 12, 2003) (the "Second MAR Order").[3]

In January 2004, the MAR court conducted an evidentiary hearing (the "MAR hearing") on Blakeney's ineffective assistance/sentencing claim, as well as his original exculpatory evidence claim. At that time, Blakeney filed a motion to reconsider the MAR court's prior rulings on his substantive jury composition and ineffective assistance/jury composition claims, which the court denied from the bench. On April 30, 2004, Blakeney amended his MAR for the last time to conform with the MAR hearing evidence, asserting that the prosecution had withheld exculpatory evidence (the "exculpatory evidence claim") beyond that complained of in his original exculpatory evidence claim.[4] By its Order and Memorandum Opinion of May 21, 2004, the MAR court rejected, inter alia, Blakeney's ineffective assistance/sentencing and exculpatory evidence claims as lacking substantive merit and being, in part, procedurally barred. See

---

[3]  The Second MAR Order is found at J.A. 934-64.

[4]  Blakeney has since abandoned his original exculpatory evidence claim, but the claim asserted in the amended MAR of April 30, 2004, which we refer to as the "exculpatory evidence claim," is now before us.

8

State v. Blakeney, No. 96 CRS 4774-4777 (N.C. Super. Ct. May 21, 2004) (the "Third MAR Order").[5]

The state supreme court, by Order of December 2, 2004, denied Blakeney's subsequent petition for a writ of certiorari. See State v. Blakeney, 607 S.E.2d 650 (N.C. 2004).

## C.

On January 31, 2005, Blakeney filed a petition for federal habeas corpus relief, pursuant to 28 U.S.C. § 2254, in the Western District of North Carolina. In his petition, Blakeney raised twenty-one issues, including his ineffective assistance/sentencing, exculpatory evidence, substantive jury composition, and ineffective assistance/jury composition claims. In response, the State filed an answer and a motion for summary judgment. Thereafter, Blakeney responded to the State's summary judgment motion, and filed his own summary judgment motion, a motion for discovery, and a motion for an evidentiary hearing. After the parties submitted further memoranda on the cross-motions for summary judgment, the district court issued its Order of May 3, 2007, denying Blakeney's habeas corpus petition, summary judgment motion, and motions for discovery and an evidentiary hearing, and granting the State's summary judgment

---

[5] The Third MAR Order is found at J.A. 2158-2300.

motion.  See Blakeney v. Lee, No. 3:05-cv-00010 (W.D.N.C. May 3, 2007) (the "Habeas Corpus Order").[6]

Blakeney timely filed a motion to alter or amend judgment and for relief from judgment under Federal Rules of Civil Procedure 59(e) and 60(b), which the district court treated as a Rule 59(e) motion seeking to relitigate its rejection of Blakeney's ineffective assistance/sentencing and exculpatory evidence claims, and to challenge the denial of an evidentiary hearing on his substantive jury composition and ineffective assistance/jury composition claims.  By its Order of June 11, 2007, the court concluded that, with respect to Blakeney's ineffective assistance/sentencing and exculpatory evidence claims, his Rule 59(e) motion constituted an unauthorized successive application for federal habeas corpus relief under 28 U.S.C. § 2244(b).  See Blakeney v. Lee, No. 3:05-cv-00010 (W.D.N.C. June 11, 2007) (the "First Rule 59(e) Order").[7]  In its First Rule 59(e) Order, however, the court further observed that Blakeney had properly made in his Rule 59(e) motion the contention that he was erroneously denied an evidentiary hearing on his substantive jury composition and ineffective assistance/jury composition claims.  Accordingly, invoking this

---

[6]  The Habeas Corpus Order is found at J.A. 2954-3079.

[7]  The First Rule 59(e) Order is found at J.A. 3096-98.

10

Court's precedent, the court gave Blakeney "the options of deleting the claims subject to the requirements of successive petitions or having his entire Rule 59(e) Motion treated as a successive application for habeas relief." First Rule 59(e) Order 5-6 (citing <u>United States v. Winestock</u>, 340 F.3d 200 (4th Cir. 2003)).

In accordance with the district court's instructions, Blakeney promptly filed a motion to amend his Rule 59(e) motion, in which he opted to withdraw his contentions with respect to his ineffective assistance/sentencing and exculpatory evidence claims. By its Order of July 9, 2007, the court granted Blakeney's motion to amend his Rule 59(e) motion, but rejected on the merits Blakeney's remaining contention that he had been erroneously denied an evidentiary hearing on his substantive jury composition and ineffective assistance/jury composition claims. <u>See</u> <u>Blakeney v. Lee</u>, No. 3:05-cv-00010 (W.D.N.C. July 9, 2007) (the "Second Rule 59(e) Order").[8]

On August 7, 2007, Blakeney timely noted this appeal. On October 22, 2007, the district court granted a certificate of appealability (the "COA") on Blakeney's ineffective assistance/sentencing claim. On March 10, 2008, we expanded the COA to include Blakeney's exculpatory evidence claim, as well as

---

[8] The Second Rule 59(e) Order is found at J.A. 3104-06.

the contention that the district court should have granted him an evidentiary hearing on his ineffective assistance/jury composition claim.[9] We possess jurisdiction over Blakeney's appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

II.

We review de novo a district court's denial of habeas corpus relief on the basis of a state court record. See Tucker v. Ozmint, 350 F.3d 433, 438 (4th Cir. 2003). Insofar as the MAR court adjudicated Blakeney's habeas corpus claims on the merits, its decision is entitled to deference pursuant to the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA"). See 28 U.S.C. § 2254(d). AEDPA mandates the use of a two-step analysis to assess whether a habeas corpus petitioner is entitled to relief. Under the first step of the analysis, we may award relief only if (1) the state court adjudication of the issue on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the

_____

[9] Blakeney has abandoned all contentions with respect to his substantive jury composition claim.

12

facts in light of the evidence presented in the State court proceeding." Id. And, even if error is identified, habeas corpus relief can only be granted, under the second step of the AEDPA analysis, if the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahmson, 507 U.S. 619, 637 (1993) (internal quotation marks omitted). The state court's factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1).

We are barred from conducting habeas corpus review "of a state prisoner's claims that are procedurally defaulted under independent and adequate state procedural rules . . . unless the prisoner can show cause for the default and demonstrate actual prejudice as a result of the alleged violation of federal law, or prove that failure to consider the claims will result in a fundamental miscarriage of justice." Lawrence v. Branker, 517 F.3d 700, 714 (4th Cir. 2008) (internal quotation marks omitted). "A state rule is adequate if it is firmly established, and regularly and consistently applied by the state court." Id. (internal quotation marks omitted).

Finally, we review a district court's denial of an evidentiary hearing for abuse of discretion. See Robinson v. Polk, 438 F.3d 350, 367 (4th Cir. 2006).

13

III.

On appeal, Blakeney's COA authorizes him to contend that the district court erred in three respects — in denying him relief on his ineffective assistance/sentencing claim, in denying him relief on his exculpatory evidence claim, and by rejecting his request for an evidentiary hearing on his ineffective assistance/jury composition claim. We assess these contentions in turn.

A.

The ineffective assistance/sentencing claim essentially has two aspects: first, whether trial counsel rendered ineffective assistance by failing to collect relevant records and provide them to Blakeney's expert psychologist for the sentencing proceedings (the "expert witness aspect"); and second, whether counsel was ineffective in failing to conduct pretrial interviews of, and then to call as character witnesses, several of Blakeney's family members and acquaintances (the "character witness aspect"). Blakeney contends that the MAR court's adjudication on the merits of both aspects of his ineffective assistance/sentencing claim "resulted in a decision that was contrary to, or involved an unreasonable application of," Supreme Court precedent. 28 U.S.C. § 2254(d). The Supreme Court explained in Williams v. Taylor that,

14

> [u]nder the "contrary to" clause, a federal habeas
> court may grant the writ if the state court arrives at
> a conclusion opposite to that reached by [the Supreme]
> Court on a question of law . . . . Under the
> "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies
> the correct governing legal principle from [the]
> Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000).

Here, as recognized by the district court, the MAR court correctly identified the controlling Supreme Court precedent, including the Court's seminal decision in Strickland v. Washington, 466 U.S. 668, 687 (1984) (recognizing that ineffective assistance claim requires showing (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense"). See Habeas Corpus Order 8. Accordingly, the relevant issue is whether the MAR court unreasonably applied that precedent to the facts of Blakeney's case — that is, "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. We assess such issue beginning with the expert witness aspect, followed by the character witness aspect, of the ineffective assistance/sentencing claim.

1.

a.

15

The MAR court concluded that the expert witness aspect of Blakeney's ineffective assistance/sentencing claim failed on both the performance and the prejudice prongs of the Strickland test. See Third MAR Order 89. In adjudicating the expert witness aspect, the MAR court provided an extensive discussion of the relevant evidence in the MAR hearing record, but largely abstained from explicitly resolving disputed issues of fact and making credibility determinations. The court observed, however, that "the evidence before [it] shows that all of this claim is without merit." Id. The court also invoked various authorities applying Strickland and its Supreme Court progeny to justify the rejection of Blakeney's "claim[] of prejudicial error." Id. at 33. Although the precise reason for the court's decision is not entirely clear, we must deem the decision to be reasonable if it "is at least minimally consistent with the facts and circumstances of the case." Wright v. Angelone, 151 F.3d 151, 157 (4th Cir. 1998) (internal quotation marks omitted).

i.

According to the MAR court, Blakeney's "experienced trial counsel" — lead counsel Robert Huffman and co-counsel Harry Crow, Jr. — retained Dr. Mark Worthen, an expert in clinical and forensic psychology, to evaluate Blakeney for the sentencing phase of the trial. See Third MAR Order 10, 89, 91. Worthen produced a seventeen-page Forensic Psychological Evaluation (the

16

"Expert Report"), dated August 28, 1997, which was incorporated by reference as part of the Third MAR Order.[10] The purpose of Worthen's evaluation, according to the Expert Report, was "to describe Mr. Blakeney's psychological functioning during the time of the alleged offenses; to provide a social and psychological history; to list any relevant psychiatric diagnoses; and to comment on his propensity for violence within the correctional system." Expert Report 1. For the Expert Report, Worthen relied on psychological testing of and interviews with Blakeney, discussions with some of Blakeney's family members, and certain records provided by trial counsel and obtained by Worthen himself. See Third MAR Order 105-06; Expert Report 2.

Trial counsel obtained school and prison records on Blakeney, and they provided those records to Dr. Worthen, along with police statements and reports about the Huntley murder. See Third MAR Order 89, 92. The prison records, from the North Carolina Department of Correction, related to Blakeney's imprisonment from 1990 to 1995 on the prior robbery with a dangerous weapon offense. See Expert Report 17. Lawyer Huffman advised Worthen that "'if you need anything else, please let me

---

[10] The Expert Report is found at J.A. 2307-23.

know.'" See Third MAR Order 89 (quoting J.A. 1182).[11] When Worthen did not follow up with any requests for further information, Huffman presumed that Worthen was satisfied with what had been provided. See id.

Dr. Worthen obtained records, on his own initiative, from the Union County Mental Health Center upon learning from Blakeney that he had also been seen there. See Third MAR Order 92. According to the Expert Report, those records reflected that Blakeney had sought treatment for substance abuse from the Union County Mental Health Center in September 1995, after being released from prison. See Expert Report 6. The records also reflect that, at that time, Blakeney was "anxious and depressed," and he was diagnosed with dependence on and withdrawal from cocaine and alcohol. Id. at 6-7.

Dr. Worthen was unable to obtain records from the North Carolina Department of Correction relating to Blakeney's reported participation in a drug and alcohol rehabilitation treatment ("DART") program, despite requesting them in two or three letters and, perhaps, a phone call. See Third MAR Order 93. Trial counsel also made unsuccessful attempts to obtain the DART records. See id. The Expert Report reflects that "Mr.

_____

[11] Where the MAR court quoted from transcripts of the MAR hearing, we provide J.A. citations for those portions of the transcripts.

18

Blakeney indicated that he participated in the DART program through the Department of Correction[] when he was incarcerated between 1990 and 1995"; that Worthen, "[u]nfortunately, . . . was not able to obtain records regarding" any such treatment; and that Worthen was "not sure if this indicates that Mr. Blakeney actually never participated in DART or if the records simply could not be located." Expert Report 6. As the MAR court later recognized, there were Department of Correction records that, if produced, would have confirmed to Worthen that Blakeney received "130 hours of instruction" in the DART program prior to the Huntley murder. Third MAR Order 94; see also J.A. 1831 (Department of Correction letter of March 28, 1994, reflecting that Blakeney completed four-week DART program at Craggy Correctional Center).

During the trial preparations, "Dr. Worthen met [lawyer] Crow in person twice, once when they met at Crow's office and he interviewed two or three of defendant's family members, and once with Huffman and Crow immediately before the sentencing phase of defendant's trial." Third MAR Order 91. The Expert Report reflects that Worthen met with Blakeney five times, conducted a series of psychological tests on him, and interviewed three of his family members: wife Tiney Blakeney, mother Gracie Blakeney, and sister Peggy Blakeney. See Expert Report 2.

19

Extensive details of Blakeney's childhood, education, and family life are provided in the Expert Report, which reflects, inter alia, that Blakeney, the youngest of nine children, was abandoned by his father as a toddler and spent his childhood living in "embarrassing" and "terrible" conditions in houses with no running water or electricity, filled with rats, snakes, and roaches. See Expert Report 3. Blakeney was intermittently cared for by his older siblings and by his mother Gracie, who was in and out of the home, being absent more often after she began dating Huntley when Blakeney was nine or ten years old. See id. Gracie Blakeney and Huntley both drank heavily and frequently fought, and Gracie "would alternate between neglecting the children and indulging [defendant]." Id. Blakeney's school performance was "below average," and he withdrew from school in the ninth grade. Id. at 5. He thereafter attempted to return to high school three different times, but "he had to find work in order to survive," making "it difficult for him to stay in school despite his several attempts." Id. Blakeney had six children with five different women, including two children with Tiney Blakeney, whom he married in February 1996. See id. at 5-6. Tiney Blakeney told Dr. Worthen "that her husband has had problems with alcohol and other drugs, but she characterized him as a good father who is able to relate to and discipline the children better than she."

20

Id. at 6. Tiney Blakeney also "indicated that she and Mr. Blakeney had arguments about finances and the fact that he was spending some of their money on alcohol and other drugs rather than the family, but she had not contemplated a separation or divorce." Id.

The Expert Report contains a narrative of Blakeney's description to Dr. Worthen of the events surrounding the Huntley murder, including Blakeney's reports of having not slept "for most of the previous three or four days and nights prior to the alleged offense" and of having consumed alcohol and smoked marijuana and crack cocaine during that time period. Expert Report 7. Nevertheless, according to the Expert Report, "Mr. Blakeney stated that at the time of the alleged offense he was not intoxicated and he was not feeling particularly bad." Id. The Expert Report also observes that Blakeney gave a written statement to police the day after the Huntley murder that did not include information about his conduct over the days prior to the murder (including his sleeplessness and substance abuse). See id. at 9. With respect to details of the murder itself, Blakeney's description of events to Dr. Worthen "varie[d] somewhat from that given to law enforcement officers in [the] written statement," and Worthen assumed that the statement to police, being closer in time to the murder, was "more accurate." Id.

21

During a screening test for alcoholism, the Expert Report reflects, Dr. Worthen "suspect[ed] that Mr. Blakeney tended to minimize problems associated with alcohol use when answering the . . . questions." Expert Report 10. Similarly,

> Mr. Blakeney also minimized the extent of his drug (including alcohol) use and related problems on . . . a substance abuse evaluation instrument. After talking with Mr. Blakeney's attorney, it became apparent that Mr. Blakeney was afraid that if he acknowledged his drug use it would somehow hurt his case. After his attorney advised him that it was crucial to be open and honest . . . , Mr. Blakeney acknowledged that he has had a long term problem with crack cocaine and that he has been a regular user of alcohol and marijuana.

Id. On one psychological test, "Mr. Blakeney likely answered 'true' to some test items indicative of more severe psychopathology than he actually exhibits, either in an attempt to look more disturbed or as a 'cry for help.'" Id. at 11.

The Expert Report includes a diagnosis of "Personality Disorder, Not Otherwise Specified (Mixed Personality Disorder) with avoidant, dependent, anti-social, and narcissistic traits," as well as cocaine, marijuana, and alcohol dependence. Expert Report 14. It also observes that "Mr. Blakeney endorsed some symptoms of dependent, avoidant, and anti-social personality disorder during [the] interview procedure," and that his sister Peggy Blakeney "indicated that she has observed her brother to exhibit signs of anti-social, narcissistic, avoidant, and dependent personality disorder." Id. at 13-14. The Expert

22

Report concludes that "[t]he substance abuse diagnoses are relevant" in that "[t]he violence that occurred would not have taken place had Mr. Blakeney not chosen to seek out more money for more drugs," and "[i]t is also likely that Mr. Blakeney's rational judgment was impaired, at least slightly, by the chronic use of alcohol and other drugs and the fact that he had reportedly been awake for most of the previous three days and nights." Id. at 16. According to the Expert Report, "Mr. Blakeney presumably did not plan well in advance to kill Mr. Huntley . . . but when confronted by Mr. Huntley, he reacted. It was at this time that the poor judgment caused by chronic drug abuse, and alleged lack of sleep, was a factor." Id. The Expert Report acknowledges, however, that there was

> no evidence that Mr. Blakeney was experiencing more severe effects of alcohol and other drug abuse such as delusions, hallucinations, or perceptual disturbances, acute physical withdrawal, or memory blackout at the time of the alleged offenses. Thus, while Mr. Blakeney's ability to adequately consider the consequences of his actions was impaired to some extent, he was not so impaired that he lost significant awareness of his circumstances nor did he significantly lose his ability to control his behavior.

Id. With respect to the diagnosis of personality disorder, the Expert Report opines that such disorder rendered Blakeney "more vulnerable to the temporary stress-reducing properties of drugs and consequently, drug addictions," and that it "also adversely affected [Blakeney's] ability to adequately consider the

23

consequences of his actions on others, due to his narcissism and anti-social attitudes." Id. at 16-17. Finally, the Expert Report reflects Dr. Worthen's opinion — based on Blakeney's lack of "a past history of violence in the [prison] setting" or "psychopathic personality" — that Blakeney "poses no greater risk for violence than the average prisoner" and does not "pose[] an imminent threat to other inmates." Id. at 17.

In his trial testimony, Dr. Worthen "repeated much of the information stated in [the Expert Report]." Third MAR Order 91. According to lawyer Crow, he "'thought Dr. Worthen's testimony in court went over fairly well. We basically had him go over the report that he provided in front of the jury and he did a good job of presenting that information. . . . [H]e did not give the impression that he had not been adequately prepared.'" Id. at 89 (quoting J.A. 1159-60).[12]

Thereafter, at the MAR hearing, Blakeney's post-conviction counsel presented records not obtained by trial counsel nor provided to Dr. Worthen prior to trial, including the following: Blakeney's DART and other records from the North Carolina Department of Correction; state Division of Social Services records concerning Blakeney's wife, Tiney Blakeney; employment

---

[12] Our review of Dr. Worthen's trial testimony confirms that it closely covered the contents of the Expert Report.

24

records for Blakeney; and records concerning victim Huntley's prior conviction for driving under the influence of alcohol ("DUI"). See Third MAR Order 90. Lawyer Huffman acknowledged during the MAR hearing that all of these records, except Huntley's DUI records, "were the types of records he would have provided Dr. Worthen prior to defendant's trial if he had collected them." Id. For his part, Worthen testified at the MAR hearing that he did not consider it his responsibility to locate witnesses or to actively collect records, but he acknowledged there are some instances when he might send a letter regarding records on the theory that an agency would respond better to a letter from a doctor than an attorney. See id. at 91-92. In Blakeney's case, Dr. Worthen understood that, in general, trial counsel would locate witnesses and obtain records, although Worthen volunteered to try to obtain records from the North Carolina Department of Correction and from the Union County Mental Health Center. See id. at 92.

Dr. Worthen further testified at the MAR hearing that he had reconsidered his prior diagnosis of Blakeney based on new information, including the records obtained by Blakeney's post-conviction counsel, which they provided to Worthen after the trial. See Third MAR Order 92. "Specifically, Dr. Worthen testified: 'I would now diagnose the defendant with depressive disorder not otherwise specified. It was not a diagnosis I

25

assigned at the time and I would not diagnose him with a personality disorder, which I did at the time.'" Id. (quoting J.A. 1245). Additionally, Worthen testified that he "would now 'render an opinion . . . [t]hat [defendant] was under the influence of a mental or emotional disturbance at the time of the crime.'" Id. (quoting J.A. 1245-46) (alterations in original). When asked whether "'the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct with the requirements of law was impaired,'" Worthen stated "his opinion that defendant 'was impaired at the time of the crime.'" Id. at 92-93 (quoting J.A. 1246).[13]

Dr. Worthen attributed the change in diagnosis to the following (collectively, the "post-conviction information"):

- His post-trial review of community member affidavits and interviews with family members (including a re-interview of sister Peggy Blakeney and interviews of four other siblings), which indicated "that defendant 'experienc[ed] symptoms of depression prior to the crime,'" Third MAR Order 93 (quoting J.A. 1248), and "'exhibited positive character traits which . . . would argue against the personality disorder diagnosis,'" id. at 96 (quoting J.A. 1267);

---

[13] Blakeney contends that Dr. Worthen's revised opinion would have supported two statutory mitigating circumstances at sentencing: (1) that "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance," and (2) that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C. Gen. Stat. § 15A-2000(f)(2), (6).

26

- Records from the North Carolina Department of Correction, including what Worthen referred to as "a previous diagnosis of depression" made while Blakeney was incarcerated before the Huntley murder, id. at 93;

- The DART records reflecting Blakeney's 130 hours of instruction during his prior incarceration, see id. at 93-94;[14]

- Additional Department of Correction records, which constituted "'more substantive evidence . . . that [Blakeney] did not exhibit behavior problems [while incarcerated], including signs of anti-social personality disorder,'" id. at 94 (quoting J.A. 1253);

- North Carolina Division of Social Services records concerning problems in Tiney Blakeney's home (including Tiney's own alcohol abuse), which records: "'provide[d] information regarding the level of [depression-inducing] stress that the defendant was under at the time leading up to the crime'"; "'corroborate[d] information from [Blakeney's] family . . . that they were having trouble in the home'"; and provided Worthen "'a better understanding of [Blakeney's] psychological condition at the time, and helped [him] to put together how [Blakeney's] substance abuse and the depression were interacting to cause a deterioration in his functioning,'" id. at 94 (quoting J.A. 1254-55); and

- Blakeney's employment records, providing "'further evidence that although his employment history was certainly not perfect, he had sought and obtained employment after his previous

---

[14]  Dr. Worthen testified that the DART records "to some extent go[] to the question of whether or not [Blakeney] had a personality disorder, how truthful he was being," and that such records also "demonstrated that he at least had some motivation to try to overcome his alcohol and other drug problems."  J.A. 1251.

incarceration'" — a fact that "'goes against the . . . impression [Worthen] had at the time [of trial] that [Blakeney] was exhibiting some narcissistic and anti-social personality traits,'" id. at 95 (quoting J.A. 1257).

Worthen testified that, if he had been provided the post-conviction information prior to trial, he "'would not have come to that conclusion [i.e., the personality disorder diagnosis], because there's information that would argue against the diagnosis of a personality disorder.'" Id. (quoting J.A. 1259). Worthen explained, inter alia, that he now saw Blakeney's drug use "'as being signs and symptoms of substance dependence itself and the depressant disorder, and as a reaction to the stress he was under, as opposed to being symptomatic of a personality disorder.'" Id. (quoting J.A. 1259).[15]

Nevertheless, in testifying at the MAR hearing to his new diagnosis, "Dr. Worthen admitted that when he interviewed

---

[15] According to Worthen, the newly obtained records were also relevant to him in the following ways: the additional Department of Correction Records reflecting Blakeney's lack of behavior problems while incarcerated corroborated Worthen's 1997 trial testimony regarding his opinion about Blakeney's future adjustment in prison, see Third MAR Order 94; the employment records demonstrated that Blakeney "passed certain urinalysis testing at work, which tends to show that 'there were some periods of time where he was not using . . . drugs,'" id. at 95-96 (quoting J.A. 1260); and Huntley's DUI records corroborated what Blakeney and his sister Peggy told Worthen about their childhood environment, i.e., "'that their stepfather was drinking a lot, had an alcohol problem, and that this cause was a source of stress within the home,'" id. at 96 (quoting J.A. 1261).

28

defendant prior to trial, defendant 'did not report that he was experiencing depressive symptoms at . . . the time of the evaluation, and it was not clear to [Dr. Worthen] whether he was experiencing depressive symptoms at the time of the crime.'" Third MAR Order 93 (quoting J.A. 1249) (alterations in original). And indeed, Worthen had testified at trial that Blakeney, during a pretrial evaluation, "'denied any suicidal thoughts or plans other than very fleeting suicidal thoughts, which he said he would not carry out. He denied any symptoms of depression.'" Id. at 106 (quoting J.A. 87, 1304). "When asked to explain the meaning of 'he denied any symptoms of depression,' Dr. Worthen replied, 'I asked him . . . if he experienced certain symptoms of depression and he said no.'" Id. (quoting J.A. 1304-05).

Moreover, on cross-examination at the MAR hearing, Dr. Worthen retreated from his characterization of "a previous diagnosis of depression" in Blakeney's North Carolina Department of Correction records, see Third MAR Order 93, explaining that he merely assumed the relevant document — a "'summary report'" reflecting that Blakeney had been referred to a staff psychologist because of admitted feelings of depression — further indicated that there was an "'official diagnosis'" of depression. Id. at 101 (quoting J.A. 1285). Worthen also agreed that it is "'common for someone going into a period of

29

long term confinement to have situational depression,'" and that "'[m]ight . . . have been what [the Department of Correction] document referred to.'" Id. at 102 (quoting J.A. 1285-86). Additionally, it was established on cross-examination that the Union County Mental Health Center report of September 1995, diagnosing Blakeney with dependence on and withdrawal from cocaine and alcohol, was "'basically square with the diagnosis that [Dr. Worthen] testified to at trial in this case,'" except that Worthen also diagnosed marijuana dependence and did not include "'the withdrawal diagnoses . . . because [he] couldn't determine whether or not [Blakeney] was in a state of withdrawal at that time.'" Id. at 103 (quoting J.A. 1291) (some alterations in original).

To corroborate Dr. Worthen's new diagnosis, Dr. James E. Bellard, an expert in the field of forensic psychiatry, also testified at the MAR hearing. See Third MAR Order 111. Bellard performed a post-conviction evaluation of Blakeney, an evaluation that involved meeting with Blakeney "on three occasions and spend[ing] about six hours with him," as well as "review[ing] many documents provided by defendant's post-conviction counsel." Id.[16] "Dr. Bellard's diagnosis of

---

[16] Dr. Bellard also interviewed defendant's sister, Peggy Blakeney. See J.A. 1426.

30

defendant's mental status at the time of the crime 'was that of . . . major depression of moderate [to] severe severity[,] without psychotic features.'" Id. (quoting J.A. 1428). Bellard opined that, "at the time of the crime, defendant was under the influence of severe mental or emotional disturbances." Id. at 112. More specifically, Bellard described his belief that Blakeney "'was suffering from a major depression, which he had been suffering for at least two months, and . . . he was suffering from the effects of the dependencies on at least cocaine and alcohol and probably marijuana. And at the time of the crime was also under the influence of cocaine, marijuana, and alcohol.'" Id. (quoting J.A. 1437-38). Bellard further opined that Blakeney's "'capacity . . . to appreciate the criminality of his conduct or to conform his conduct to the requirements of law' was impaired." Id. (quoting J.A. 1438) (alteration in original). On this point, Bellard explained that "'with that combination of chemicals in the system, combined with the depression, I believe [Blakeney's] ability to make reasonable decisions and weigh[] options was impaired. And so in general you can support and corroborate Dr. Worthen's revised opinion as to depression and the presence of these mental health impairments.'" Id. at 113 (quoting J.A. 1438).[17]

---

[17] Although, in evaluating Blakeney, Dr. Bellard reviewed (Continued)

31

The MAR court noted Dr. Bellard's MAR hearing testimony about factors in Blakeney's life history significant to his overall mental status, including the following:

> that defendant "shows a family history [for] alcoholism"; that defendant's parents "split up by age two and [defendant] didn't ever have a relationship with his father past that point"; that "no specific person . . . took a specific interest in [Blakeney]"; that things at defendant's home were "pretty chaotic"; that defendant "didn't do well in school"; that defendant "was promoted socially several times and left school in the ninth grade"; [and] that defendant had "a brother who died in the mid-eighties that was very close to him."

Third MAR Order 113 (quoting J.A. 1439-44) (some alterations in original).  On cross-examination, Bellard agreed that there was no indication that Blakeney had been diagnosed with depression prior to the Huntley murder, including during his 1990-1995

---

various documents, including those included in the post-conviction information, his MAR hearing testimony reflects that the major depression diagnosis was largely based on his interviews with Blakeney and his sister Peggy.  Specifically, Dr. Bellard testified that Blakeney and Peggy were "able to describe [seven symptoms of depression] for a period of at least two months before [the Huntley murder]."  J.A. 1431.  According to Bellard, "[i]t's possible but speculative that [Blakeney] had clinical signs for long before that."  Id.  When asked how he "would . . . rate Roger Blakeney's depression at the time of the incident," Bellard responded that, "based on [Blakeney's] report and his sister's report, I would rate him as moderate to severe."  Id. at 1433.  Bellard also noted that there "is a minor distinction" between his diagnosis of major depression and Dr. Worthen's diagnosis of depressive disorder, but that both of the diagnoses were of "active disorders about depression."  Id. at 1448.

32

incarceration in North Carolina and his September 1995 visit to the Union County Mental Health Center.  See id. at 114, 116. Bellard also acknowledged that Blakeney had "'some things that would satisfy some of the criteria . . . for personality disorders,'" but he clarified that "'the vast majority of individuals'" also satisfy some of the personality disorder criteria, and that he did not "'think [Blakeney] has a personality disorder.'"  Id. at 116 (quoting J.A. 1461).

Finally, the MAR court accepted Dr. Pamela Laughon as an expert in the field of psychology on behalf of Blakeney.  See Third MAR Order 118.  "She opined that it is 'customary' for trial attorneys to collect information, such as documents and records, and provide them to any psychologist evaluating a client."  Id. (quoting J.A. 1691).

ii.

In ruling against Blakeney on the expert witness aspect of his ineffective assistance/sentencing claim, the MAR court invoked our decision in Byram v. Ozmint, 339 F.3d 203 (4th Cir. 2003), among various other authorities applying Strickland and its Supreme Court progeny.  See Third MAR Order 34 (characterizing Byram as "a case having similarities to the case at bar").  We recognized in Byram that, to satisfy Strickland's performance prong, "the defendant 'must show that counsel's performance was deficient'" by "produc[ing] evidence that

33

'counsel's representation fell below an objective standard of reasonableness.'" 339 F.3d at 209 (quoting Strickland, 466 U.S. at 687, 688). More specifically, we observed that

> [a] failure to obtain available records . . . does not show that counsel's investigation was inadequate. Attorneys will not be found ineffective unless they fail to make a reasonable investigation for possible mitigating evidence. And the reasonableness of an investigation, or a decision by counsel that forecloses the need for an investigation, must be considered in light of the scarcity of counsel's time and resources in preparing for a sentencing hearing and the reality that counsel must concentrate his efforts on the strongest arguments in favor of mitigation.

Id. at 210 (internal citations and quotation marks omitted). We further observed in Byram, on the prejudice prong of Strickland, that "[a] showing of prejudice requires the defendant to prove that 'counsel's errors were so serious as to deprive the defendant of a fair trial.'" Id. at 209 (quoting Strickland, 466 U.S. at 687). And we explained that, "[i]n the context of a capital sentencing proceeding, the question is whether 'but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Id. (quoting, inter alia, Strickland, 466 U.S. at 694). Finally, we concluded that where, "[i]n light of the wealth of information presented by trial counsel [at sentencing], additional information [contained in unobtained records] would have added little[,] [t]here was no 'reasonable probability' that the outcome would have been

34

different had trial counsel conducted an even more exhaustive investigation." Id. at 211.

Applying these principles in Byram, we first rejected Byram's claim that his trial counsel rendered deficient performance at sentencing by deciding not to present psychological evidence, on the ground that counsel made a reasonable strategic decision in recognition of the potential harm posed by such evidence. See 339 F.3d at 210. Notably, we also recognized that trial counsel was not obligated "to 'shop around' for a favorable expert opinion after an evaluation yield[ed] little in mitigating evidence." Id. Furthermore, we rejected trial counsel's failure to obtain certain records as a basis for the ineffective assistance claim, under Strickland's performance and prejudice prongs, on the grounds that reasonable efforts were made to obtain those records and that, in any event, they "would have added little" to "the wealth of information presented by trial counsel" in support of Byram's mitigation case. Id. at 210-11.

b.

For Blakeney to prevail in these habeas corpus proceedings on the expert witness aspect of his ineffective assistance/sentencing claim, we would have to conclude that the MAR court unreasonably applied Supreme Court precedent in rejecting such claim under both the performance and prejudice

35

prongs of Strickland.  Blakeney contends that he is entitled to relief on the premise that Dr. Worthen's initial personality disorder diagnosis — the diagnosis to which Worthen testified during the trial's sentencing phase — was the result of trial counsel's failure to obtain and provide the post-conviction information.  Blakeney asserts that the personality disorder diagnosis "was harmful to Blakeney, and did not support the submission of any statutory mental health mitigators."  Br. of Appellant 24 (emphasis omitted).  And, Blakeney maintains that,

> [i]f Dr. Worthen had been provided access to the [post-conviction information], he would have abandoned the damaging diagnosis of [personality disorder], and recognized that Blakeney was suffering from depression.  There is at least a reasonable probability that had the jury understood that defendant was suffering from a depressive disorder and resulting substance abuse, as opposed to an anti-social personality disorder, at least one juror would have reached a different conclusion.

Id. at 28-29.  Unfortunately for Blakeney, though we are willing to assume that he has satisfied Strickland's performance prong, we cannot rule in his favor on the prejudice prong.

Specifically, even accepting that the MAR court found Dr. Worthen's post-conviction diagnosis of depressive disorder to be credible — a dubious notion in light of the evidence highlighted in the Third MAR Order, including Worthen's testimony that Blakeney had originally endorsed symptoms of personality disorder and denied symptoms of depression — the court could yet

36

reject the proposition that Worthen's change in diagnosis depended on the post-conviction information. As the district court observed in its Habeas Corpus Order, "[a]ssuming arguendo that the post-conviction diagnosis is the more accurate one, Dr. Worthen did not need counsel's help to diagnose Blakeney with a depressive disorder." Habeas Corpus Order 10. This is evident from the MAR hearing testimony of Dr. Bellard, corroborating Worthen's post-conviction diagnosis, in that Bellard relied for his major depression diagnosis on sources of information that were available to Worthen when he made his initial diagnosis of personality disorder. See id. at 12. Specifically,

> [l]ike Dr. Worthen's [initial diagnosis], Dr. Bellard's diagnosis was based upon his interview/evaluations with Blakeney and his interview with [Blakeney's sister] Peggy. According to Dr. Bellard, Blakeney reported experiencing seven identifiable symptoms of the illness of depression at the time of the [Huntley] murder. Significantly, Blakeney and Peggy were able to describe those symptoms as having existed for at least two months prior to the murder.

Id. at 11; see also supra note 17. Moreover, those factors of Blakeney's life history noted by the MAR court as being significant to Bellard in assessing Blakeney's overall mental status — his family history of alcoholism, the absence of his father or another adult role model, the chaotic nature of his home life, his lack of success in school, and the loss of his brother — were largely known to Worthen prior to trial and

37

discussed in his Expert Report. In these circumstances, Worthen's MAR hearing "testimony that it was the [post-conviction information] that made his diagnosis of depressive disorder possible is unconvincing." Habeas Corpus Order 12.

Accordingly, we agree with the district court that, "[w]hatever the reason for Dr. Worthen's original diagnosis, the record indicates that he had the necessary resources to make a diagnosis of depressive disorder prior to trial. As such, any prejudice arising from the original diagnosis is not attributable to trial counsel and cannot support an ineffectiveness of counsel claim." Habeas Corpus Order 14 (citing McHone v. Polk, 392 F.3d 691, 706 (4th Cir. 2004) (concluding that any ineffectiveness arising from expert's failure to utilize readily available evidence is attributable to expert rather than to counsel and, thus, cannot support Strickland claim)); see also Byram, 339 F.3d at 211 (recognizing lack of prejudice resulting from counsel's failure to obtain records, where additional information in those records "would have added little").[18]  We thus affirm the district court's

---

[18]  To the extent that Blakeney contends that he was prejudiced by his trial counsel's failure to obtain the DART records, because the prosecution used the absence of such records to paint Blakeney as a liar, we agree with the district court's rejection of such contention:

(Continued)

denial of habeas corpus relief on the expert witness aspect of the ineffective assistance/sentencing claim.

2.

a.

The MAR court also concluded that the character witness aspect of Blakeney's ineffective assistance/sentencing claim failed on both the performance and the prejudice prongs of the

---

Ultimately, [Blakeney] cannot show that he was prejudiced by counsel's failure to obtain the DART records. The absence of DART records was only one example of several cited by the prosecutor as evidence that Blakeney was untruthful and that Dr. Worthen did not believe what Blakeney had told him. The prosecutor argued, without objection, that Dr. Worthen did not believe what Blakeney had told him about the arson and murder and that he did not believe the answers that Blakeney had given to some of the questions on the psychological tests. Indeed, Dr. Worthen testified at sentencing that the story Blakeney had told the police was likely more accurate than the very different story that Blakeney had told him about the crimes. He also testified that on the questionnaires he administered, Blakeney minimized his substance abuse problems, and that he (Dr. Worthen) had to adjust for that in making his diagnosis. Dr. Worthen testified that he likewise had to adjust for the fact that Blakeney exaggerated some symptoms of psychological problems on at least one of the tests that he took. The jury, therefore, had ample evidence to conclude that Dr. Worthen doubted Blakeney's veracity. As such, there is no reasonable probability that the jury would have returned a life sentence had the prosecutor not been able to argue that the absence of the DART records was evidence that Blakeney was not truthful.

Habeas Corpus Order 16-17.

39

Strickland test.  See Third MAR Order 54.  According to the MAR court, "[t]rial counsel's pretrial investigative efforts were well within the acceptable 'wide range of reasonable professional assistance' required by the first prong of the Strickland test and not the source of prejudice that is the second prong of the Strickland test."  Id. (quoting Strickland, 466 U.S. at 689).  Importantly, the court supported its ruling with explicit findings of fact and legal analysis.

i.

The MAR court found that "[o]ne of trial counsel's most significant pretrial investigative efforts involved [lawyer] Crow's discussions with defendant," which provided counsel with, inter alia, "information about defendant's background and family," "information about defendant's prior criminal conviction and sentence," and "information about defendant's presence in his mother's house on" the day of the Huntley murder.  Third MAR Order 54.  "While preparing for trial, Crow asked defendant about people who were not his family members to whom trial counsel might talk about testifying as character witnesses."  Id. at 59.  Blakeney suggested Jerry Leak, his former supervisor at the City of Monroe Sanitation Department, and Crow then spoke with Leak but did not call him as a witness.  See id. at 59, 60.  Blakeney "also told Crow that there were people working at the jail who could testify about how he had

40

gotten along while incarcerated and awaiting trial." Id. at 59. "Crow questioned Officer Tim Phillips and Deputy Sheriff Andrew Simmerson, obtained a basic good report from them concerning defendant's conduct in jail, and thereafter called Phillips and Simmerson to testify at trial that defendant had been a good inmate." Id.

As for family members, Crow "was well acquainted with" Blakeney's sister, Peggy Blakeney, whom Crow "had previously represented" and known "for about three or four years before he represented defendant." Third MAR Order 60. Counsel also conducted pretrial interviews with Blakeney's mother, Gracie Blakeney, and wife, Tiney Blakeney. See id. Peggy, Gracie, and Tiney Blakeney are apparently the family members referred to in the MAR court's finding that Crow "talked to some of defendant's family members and sized them up to determine whether he thought they would make good witnesses for the defense." Id. at 63.

Counsel ultimately decided, with respect to Peggy, Gracie, and Tiney, to call only Peggy as a witness. "Crow knew that being a witness can be difficult," but that Peggy "had the composure to be a witness." Third MAR Order 63. By contrast, Crow "ruled out" calling Gracie and "did not feel that Tiney . . . would be a good witness." Id. With specific regard to Tiney,

41

> Crow decided not to call [her] as a witness at trial because he thought she might present some testimonial evidence that could hurt defendant's case. More precisely, Crow thought that evidence from [Tiney] concerning defendant's use of alcohol and drug abuse would be the proverbial two-edged sword that cuts both ways and would hurt defendant in the eyes of the jury.

Id. at 61. Counsel decided to present evidence on Blakeney's background through the defense's expert psychologist, Dr. Worthen, rather than family members (other than Peggy), because, as Crow explained, "'I just felt like we could get all we needed in through Dr. Worthen without putting on people as witnesses who might not be able to express themselves as well as Dr. Worthen.'" Id. at 63-64 (quoting J.A. 1118). Crow added that "'I liked the Blakeney family, but it helps to have somebody who's experienced and has some composure to testify.'" Id. at 64 (quoting J.A. 1118).

During the trial's sentencing phase, counsel called a total of four witnesses: Dr. Worthen, Peggy Blakeney, and jail personnel Phillips and Simmerson. See Third MAR Order 60. Counsel also "encouraged family members to attend defendant's trial to show support for defendant." Id. at 60-61. During the trial, counsel spoke with several family members "who were present for the trial and could have testified about their knowledge of defendant." Id. at 61. "[C]ounsel made a tactical decision," however, "not to call as witnesses any of defendant's

42

family and friends other than those witnesses who were called to testify." Id. Crow believed

> "that we could bring out what we needed to bring out about [Blakeney's] family background, through the information that Dr. Worthen got, and it was going to be presented by an experienced witness, and I thought that would come over a lot better than by presenting the individual family members who [we were not] real sure could handle testifying."

Id. (quoting J.A. 1127) (second alteration in original). Crow also explained that one of the reasons he decided not to call the additional family members "'was the fact that I really had no prior contact with [them],'" explaining that "'[i]t's hard to make a [really] good decision about something like that, with such short contact. I already had pretty well in my mind what I was going to do. That would require a change of strategy that I didn't feel comfortable with.'" Id. at 64 (quoting J.A. 1164) (third alteration in original).

During the MAR hearing, "[w]hen asked to reply to the allegation that trial counsel provided professional services below the requirements of Strickland by failing to adequately interview defendant's family members and other character witnesses," Crow responded as follows:

> "Hindsight is twenty, twenty. I interviewed and talked to the people that [they, the family members] made . . . available to us, and that I ultimately felt comfortable with. I guess the bottom line, I talked to those people that came forward and I urged them — and I would have talked to anybody else, any other family member that had — had they brought along with

43

them. It's their family. I felt that they were the ones who could involve the other family members better than anybody else. That's all I know to answer."

Third MAR Order 63 (quoting J.A. 1158-59) (alterations in original).[19] According to the MAR court,

> Crow thought that defendant's family members were "all good people," but he also knew that none of them were "what you might call leading citizens [in] the community." None of defendant's family members held public office; none were members of any profession (e.g., ministers, lawyers, doctors, bankers). Thus, Crow did not call as witnesses at trial all of defendant's brothers and sisters.

Id. at 64 (quoting J.A. 1118).[20]

---

[19] Crow similarly testified at the MAR hearing that "'I guess in hindsight I should have gone out and hunted each one down and talked to them. Ideally that's what I should have done, no question about that. I told Gracie, I told Tiney, I told Peggy, this is your son, this is your brother, people come to my office, bring other family members, we can talk. And those were the ones that came.'" Third MAR Order 64 (quoting J.A. 1165).

[20] Notably, Crow's "leading citizens in the community" testimony came in response to the State's questions about whether any Blakeney family member was "a college graduate," "a leading citizen in the community," a holder of "any elective office," or a professional such as a "minister[], lawyer[], doctor[], banker[,] etc." J.A. 1118-19. Crow offered that, "[f]or better or worse, that's true, they weren't. But they're good people. I don't want to disparage any. They're — from what I know about them, they're all fine, honorable people." Id. at 1119. The State then responded that it "didn't mean to suggest otherwise" by its questions. Id. With this context, it does not seem, as the MAR court suggested, that Crow indicated that he did not call more family members as witnesses because they were not "leading citizens in the community" or members of any profession.

44

Post-conviction counsel presented fourteen character witnesses at the MAR hearing — eight family members (including Peggy, Gracie, and Tiney Blakeney) and six non-relatives (including former supervisor Leak). The MAR court observed that, "[i]n general, they each testified that they believed defendant was a man of good character and a nice person, and that they would have testified to that effect if they had been called as witnesses at defendant's 1996 trial." Third MAR Order 64-65. The court concluded, however, that "the stated basis of their opinions and the nature of their responses during cross-examination were such that their opinions would have no more than a <u>de minimis</u> [e]ffect on a reasonably objective juror evaluating the evidence and the aggravating and mitigating circumstances in defendant's case." <u>Id.</u> at 65; <u>see also</u> <u>id.</u> at 65-85 (detailing character witnesses' MAR hearing testimony).

ii.

In denying relief on the character witness aspect of Blakeney's ineffective assistance/sentencing claim, the MAR court concluded, with respect to the performance prong of <u>Strickland</u>, that "[t]rial counsel's investigation of defendant's background and his circumstances in life was objectively reasonable," that "[t]here was no inattention to this matter by trial counsel," and that there was nothing to indicate "that what trial counsel knew of defendant would have led a reasonable

45

attorney to investigate further." Third MAR Order 85. The court further ruled that, "[a]lthough trial counsel interviewed far fewer potential witnesses than postconviction counsel presented at the [MAR] hearing, trial counsel's interviewing of potential witnesses was objectively reasonable performance that was [not] below the requirements of the first prong of the Strickland test." Id. at 86. The court distinguished Wiggins v. Smith, 539 U.S. 510, 524 (2003) (deeming counsel ineffective for "abandon[ing] their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"). See Third MAR Order 85 (observing that "there was in the case at bar nothing remotely approaching the egregious neglect of the counsel in Wiggins"). And, the MAR court drew favorable comparisons to three of our decisions: Tucker v. Ozmint, 350 F.3d 433, 441-42 (4th Cir. 2003) (concluding that counsel's performance "far surpassed the inadequate performance described in Wiggins," in that counsel, inter alia, "presented an expert psychologist who gave the jury a full picture of Tucker's disturbing social history"); Byram, 339 F.3d at 210 (rejecting ineffective assistance claim where, "[u]nlike in Wiggins, . . . counsel here spent considerable time developing a picture of Byram's life"); and Bacon v. Lee, 225 F.3d 470, 481 (4th Cir. 2000) (observing that "Bacon's counsel could reasonably have concluded. . . that the evidence they had

46

developed . . . would give the jury an accurate picture of Bacon's personality and that further investigation into Bacon's background would not be fruitful"). See Third MAR Order 86.

On Strickland's prejudice prong, the MAR court "re-weighed the evidence in aggravation against the totality of available mitigating evidence." Third MAR Order 88 (citing Wiggins, 539 U.S. at 534; Tucker, 350 F.3d at 442). The court explained that, in particular, it considered the following circumstances:

> (a) that several of the witnesses demonstrated an obvious bias in favor of defendant based on their past close familial relationship to him; (b) that several of the witnesses based their opinion that defendant was a man of "good character" on factors not normally considered to be indicia of good character; (c) that considerable evidence of record shows that defendant is not a man of good character (e.g., the evidence of his history of substance abuse and his commission of armed robbery, larceny, assault, arson, and murder); (d) that defendant did not introduce any significant evidence affirmatively proving that he is in fact a man of good character; and, (e) that evidence of record shows that after defendant completed the DART program while serving five years confinement and after he was placed on probation, defendant disregarded the lessons he should have learned and returned to the costly and debilitating practice of using illegal drugs.

Id. at 87. This assessment led the court to conclude that trial counsel's failure to interview and call more character witnesses was not "the source of prejudice that is the second prong of the Strickland test." Id. at 86.

b.

47

In these habeas corpus proceedings, Blakeney contends that he is entitled to relief because "counsel's unreasonably limited investigation resulted in a failure to discover readily available evidence of their client's positive character and past behavior, the very kind of evidence that could compel at least one juror to find the client's life to be worth saving."  Br. of Appellant 22 (citing Wiggins, 539 U.S. at 537).  According to Blakeney, the additional character witnesses who testified at the MAR hearing would have "provided important positive evidence to counter the State's demonization of Blakeney" at trial.  Id. at 24.

Of the eight family members and six non-relatives, Blakeney specifically discusses in this appeal the MAR hearing testimony of five of them:

- Union County Deputy Sheriff Curtis Parker, "who had known Blakeney all his life, and testified that [the Huntley murder] was 'out of character' for him";

- Leak, Blakeney's former supervisor while employed by the City of Monroe, "who spoke positively about [Blakeney's] work";

- Blakeney's brother, Jimmy Blakeney, who corroborated that Blakeney completed the DART program during his prior incarceration;

- Gracie Blakeney, who "admitted that she and Huntley exposed her son to extensive alcohol abuse and violence," and who "expressed love for her son and her desire that mercy be shown for his culpability in" Huntley's death; and

48

- Tiney Blakeney, who "shed light on the chaotic household in which [Blakeney] was living before the crime," testified about his drug abuse, and described him as a nonviolent "good person" whom she loved.

Id. at 10-12. Blakeney generally describes the other non-relative witnesses, with one exception, as "life-long citizens of Union County, gainfully employed, and without criminal records," who testified that Blakeney "had performed good deeds and positive acts in the community, that he did not have a juvenile criminal history, [and] that he was usually nonviolent." Id. at 11 & n.2. Similarly, Blakeney's family member witnesses "[a]ll are life-long residents of Union County, and none has a criminal record. All articulated positive memories about Blakeney and described his positive characteristics, along with his debilitating background and the dysfunctional household in which he grew up." Id. at 11.

According to Blakeney, the MAR court's ruling on the prejudice prong of Strickland means that "a family member cannot credibly testify for a defendant because of bias," and a defendant "cannot have any positive character traits, since he has committed a bad act." Br. of Appellant 33. Blakeney asserts that the MAR court ruling cannot stand. Otherwise, contrary to Supreme Court precedent, "no defendant could ever present family witnesses or mitigating lay testimony because the murder conviction — the ultimate evidence of bad character —

49

would always preclude any testimony about good character traits." Id. (citing, inter alia, Wiggins, 539 U.S. at 535).

Although we may assume that Blakeney has satisfied Strickland's performance prong, as we did with respect to the expert witness aspect of the ineffective assistance/sentencing claim, we again cannot rule in his favor on the prejudice prong of Strickland.[21] Simply put, whatever else the merits of the MAR court's prejudice ruling, the additional character evidence testimony was substantially cumulative and, thus, can reasonably be said to "have no more than a de minimis [e]ffect on a reasonably objective juror evaluating the evidence and the aggravating and mitigating circumstances in defendant's case." Third MAR Order 65. As the district court recognized, "[t]he testimony of Blakeney's friends and family at the MAR hearing was largely repetitive of the evidence offered at sentencing through Dr. Worthen and Peggy." Habeas Corpus Order 19. Moreover, "the additional mitigating evidence, when combined with what the jury learned at sentencing, would [not] have been enough to outweigh the aggravating evidence in this case." Id. at 24.

---

[21] Because we assume that Blakeney has satisfied the performance prong of Strickland, we express no views (contrary to the depiction of this opinion by our dissenting colleague) on the reasonableness of trial counsel's performance or the MAR court's assessment thereof.

50

Accordingly, the character witness aspect of Blakeney's ineffective assistance/sentencing claim fails for lack of a sufficient showing of prejudice. See Tucker, 350 F.3d at 445 (recognizing that trial counsel's failure to expose impeachment evidence against prosecution expert was non-prejudicial, where expert's testimony was cumulative and, "[c]onsidering the aggravating and mitigating circumstances present in this case," confidence in outcome of trial was not undermined); Byram, 339 F.3d at 211 (concluding there was no prejudice resulting from failure to present additional information about Byram's childhood, where "the evidence presented before the [state post-conviction relief] court was largely cumulative"). We therefore affirm the district court's denial of habeas corpus relief on this aspect of such ineffective assistance claim.

## B.

Next, we turn to Blakeney's exculpatory evidence claim, which also has two aspects: first, whether the prosecution withheld, in contravention of his due process rights as recognized in Brady v. Maryland, 373 U.S. 83 (1963), the DART records from the North Carolina Department of Correction (the "DART records aspect"); and second, whether the prosecution committed a Brady violation by failing to reveal the fact that Blakeney had confessed to the Huntley murder after Detective Ronnie Honeycutt of the Union County Sheriff's Department told

51

him "it was time for him to stop hurting his family and hurting himself and tell the truth" (the "confession aspect").  As the Supreme Court has explained,

> [t]here are three components of a true <u>Brady</u> violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

<u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  We assess whether the MAR court unreasonably applied <u>Brady</u> and its Supreme Court progeny to the facts of Blakeney's case, beginning with the DART records aspect, followed by the confession aspect, of the exculpatory evidence claim.

1.

The MAR court concluded that the DART records aspect of Blakeney's exculpatory evidence claim failed on the merits because, inter alia, "[d]efendant has not shown that the Department of Correction was acting on behalf of either the prosecutor or any state law enforcement agency investigating the murder of Callie Huntley at the time of the alleged non-disclosures."  Third MAR Order 131 (citing, inter alia, <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995), for proposition that duty to disclose encompasses material in possession of prosecutor as well as material "known to the others acting on the government's behalf in the case, including the police").  The MAR court

52

further concluded that "the information allegedly withheld was not 'material' to either defendant's conviction or sentence." Id. at 135 (citing Strickler, 527 U.S. at 289, for proposition that, to establish prejudice, petitioner must show "a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense" (internal quotation marks omitted)).

Without reaching the issue of whether the Department of Correction was acting on behalf of the prosecution when it failed to disclose the DART records, we conclude that Blakeney has not made a sufficient showing of prejudice. See supra note 18 (quoting Habeas Corpus Order 16-17). We thus affirm the district court's denial of habeas corpus relief on the DART records aspect of Blakeney's exculpatory evidence claim.

2.

The MAR court rejected the confession aspect of the exculpatory evidence claim as both procedurally barred and lacking in substantive merit. See Third MAR Order 124, 129-31. The district court concluded that the MAR court's procedural ruling — that Blakeney had abandoned the confession aspect on direct appeal, thus triggering the North Carolina General Statute section 15A-1419(a)(3) bar on collateral review — was premised on a misreading of the issue. See Habeas Corpus Order 42-43. The court thus proceeded to analyze the merits of the

53

confession aspect, but rejected Blakeney's request for habeas corpus relief thereon.  See id. at 43.  In this appeal, the parties dispute whether the confession aspect was procedurally defaulted.  Because we conclude that it fails on the merits, we need not reach the procedural default question.  See Eaton v. Angelone, 139 F.3d 990, 994 n.1 (4th Cir. 1998) ("Because we agree with the district court's denial of Eaton's ineffectiveness claim on the merits, we need not resolve the thorny issue of procedural default.").

Blakeney contends that "Detective Honeycutt revealed for the first time at the MAR hearing that Blakeney's confession came only after the detective made an appeal to Blakeney's humanity . . . .  Such an [empathetic], emotional response to an appeal to Blakeney's feelings for his family would have been contrary to the picture the prosecution sought to paint of Blakeney as cold, calculating, anti-social and devoid of any feelings for anyone but himself."  Br. of Appellant 40-41. Unfortunately for Blakeney, however, no Brady violation occurred, because Blakeney, as a participant in the conversation with Honeycutt, is presumed to know what was said.  See United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004) ("We have explained that information actually known by the defendant falls outside the ambit of the Brady rule." (citing Fullwood v. Lee, 290 F.3d 663, 686 (4th Cir. 2002))).  In these circumstances, we

54

affirm the district court's denial of habeas corpus relief on the confession aspect of Blakeney's exculpatory evidence claim.

## C.

Finally, we assess Blakeney's contention that he is entitled to an evidentiary hearing on his ineffective assistance/jury composition claim. The premise of the ineffective assistance/jury composition claim is that Blakeney's trial counsel was constitutionally ineffective in failing to object to the prosecution's jury selection under Swain v. Alabama, 380 U.S. 202, 223 (1965) (recognizing that inference of purposeful discrimination would be raised on evidence that prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be," removes qualified African-American prospective jurors who have survived challenges for cause, so that no African-Americans "ever serve on petit juries"). Of course, by its decision in Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court "replaced Swain's threshold requirement to prove systemic discrimination under a Fourteenth Amendment jury claim, with the rule that discrimination by the prosecutor in selecting the defendant's jury sufficed to establish the constitutional violation." Miller-El v. Dretke, 545 U.S. 231, 236 (2005). Nevertheless, Blakeney maintains that Swain survives Batson, relying on Miller-El. In deciding whether the district court

abused its discretion in denying Blakeney an evidentiary hearing on his ineffective assistance/jury composition claim under Swain, we first review the procedural history of this and related claims pursued by Blakeney, and then turn to our analysis.

1.

Blakeney first challenged the composition of his jury at trial, having unsuccessfully made written and oral motions to dismiss the jury venire based on an alleged under-representation of African-American citizens. The state supreme court affirmed on direct appeal, concluding that the difference in the makeup of the jury venire and the general population was not statistically significant, and observing that Blakeney had failed to allege (as required to sustain his claim) that the under-representation of African-American citizens was the result of systemic exclusion in the jury selection process. See State v. Blakeney, 531 S.E.2d 799, 808-09 (N.C. 2000). Also on direct appeal, Blakeney asserted ineffective assistance of trial counsel for failure to make a Batson objection to the prosecution's peremptory challenge to one African-American prospective juror, Robert Crawford. See id. at 814. The state supreme court concluded that "defendant has not demonstrated that his counsel was ineffective by failing to make a Batson objection. Rather, defendant has shown only that he is black

56

and that the State peremptorily struck one black prospective juror.  This is insufficient to establish a prima facie case of racial discrimination."  Id. at 815 (internal quotation marks omitted).

Thereafter, in his MAR, Blakeney asserted his substantive jury composition claim, alleging that "[t]he prosecution used its peremptory challenges to excuse all eligible African-American jurors" from his trial as part of a pattern of discrimination, J.A. 731, and citing three other Union County cases as evidence.  The MAR court rejected the substantive jury composition claim as procedurally barred for having been "previously determined on the merits upon an appeal"; waived by Blakeney's failure to raise the three other Union County cases at trial; and without merit in light of the disparate facts of one of the other Union County cases (in which the defendant was Native American and did not challenge the jury composition on direct appeal), and the failure of jury composition challenges in the remaining two Union County cases.  First MAR Order 78, 81-84.

Blakeney then amended his MAR to raise the ineffective assistance/jury composition claim, repeating his allegation that "[t]he prosecution used its peremptory challenges to excuse all eligible African-American jurors" from his trial, and further asserting that "trial counsel failed to investigate and present

available and credible evidence that the prosecutor's conduct impermissibly excused all African-American jurors not only in [his] case, but in prior capital cases in Union County." J.A. 840. Blakeney again raised the three other Union County cases, and he invoked Swain, Batson, and Miller-El. The MAR court rejected the ineffective assistance/jury composition claim as procedurally barred and without substantive merit. First, the court observed that, contrary to Blakeney's allegation of peremptory challenges being used to exclude "African-American jurors" from his trial, only one African-American prospective juror (Crawford) was peremptorily challenged. See Second MAR Order 3. Additionally, the court observed that Blakeney's assertion about discrimination in other Union County cases was not supported by the three other Union County cases cited. See id. at 4. The court also observed that the three other Union County cases, as well as Blakeney's own case, "are matters of record affirmatively showing an absence of prosecutorial misconduct during jury selection." Id. at 11. The court concluded that the ineffective assistance/jury composition claim was procedurally barred for having been raised in Blakeney's direct appeal, by way of his Batson-related ineffective assistance claim. See id. at 16. Further, the court rejected the claim on the merits by ruling that, because Blakeney could not establish ineffective assistance for failure to make a

58

Batson objection, he could not do so for failure to make a Swain objection. As the MAR court explained, "a defendant can not establish either an 'old' Swain violation or a 'new' Batson violation unless he can prove that a prosecutor in his case engaged in racially discriminating use of peremptory challenges." Id. at 20.

In these habeas corpus proceedings, the district court considered and rejected the ineffective assistance/jury composition claim on the merits. As an initial matter, the court properly recognized that the relevant state court decision for AEDPA purposes in these proceedings is that of the state supreme court on direct appeal. See Habeas Corpus Order 32-33 (citing Goins v. Angelone, 226 F.3d 312, 320 (4th Cir. 2000)). The district court then observed that,

> [o]rdinarily, the Court would review the North Carolina Supreme Court's decision to determine whether it was contrary to or an unreasonable application of established Federal law. However, [Blakeney] does not challenge that court's adjudication of this issue in any way. In fact, he does not directly acknowledge that he raised a Batson-related [ineffective assistance] claim on direct appeal. He does not assign error to the state Supreme Court's factual or legal conclusions rejecting his Batson-related [ineffective assistance] claim. Most importantly, he has not directed this Court to any relevant circumstances from his trial or the record on appeal that would constitute evidence of discriminatory intent on the part of the prosecutors when they used a peremptory challenge to strike Robert Crawford (e.g. racially suspect comments by the prosecutors during voir dire, similarities between voir dire answers by white jurors who were not excused by the prosecutor

and those of Robert Crawford, etc.). Because [Blakeney] has not alleged error on the part of the state Supreme Court or challenged that court's conclusion that there is no evidence in the record on appeal of discriminatory intent by the prosecutor when he removed Robert Crawford, he has waived any argument in this Court that the state Supreme Court was incorrect in either its factual or legal conclusions.

Since [Blakeney] waived any challenge to the North Carolina Supreme Court's conclusion that there is no evidence of discriminatory intent by the prosecutor when he removed Robert Crawford, his support for a prima facie case of a Batson violation by the State consists solely of the following evidence presented in his MAR and in the instant claim: 1) [Blakeney] is African-American; 2) prosecutors used a peremptory strike to excuse Robert Crawford, an African American, from [Blakeney's] jury; and 3) in three other Union County capital cases, prosecutors allegedly struck all African American jurors who were not struck for cause. [Blakeney] refers to the three prior Union County capital cases as "Swain" evidence and argues that under Swain[, 380 U.S. at 222-24], he is entitled to show the prosecutor's systemic use of peremptory challenges to strike African-American jurors over time. It appears that [Blakeney's] argument is that had trial counsel made a Batson objection and presented evidence from [the three other Union County cases], it would have been sufficient to establish a prima facie case of discriminatory intent on the part of the prosecutors when they excused Robert Crawford.

Habeas Corpus Order 33-35 (internal citations and quotation marks omitted).

The district court concluded that, even "[a]ssuming that Swain's prima facie evidentiary standard survived Batson, [Blakeney's] evidence of 'historical systemic exclusion' is insufficient to raise an inference of discriminatory intent in his own case." Habeas Corpus Order 35. The court therefore

60

ruled that Blakeney's ineffective assistance/jury composition claim failed on the first prong of Strickland, in that trial counsel was not deficient in failing to challenge the exclusion of Crawford from Blakeney's jury. See id. at 37. Additionally, the court observed that, even if counsel had been deficient, Blakeney could not make Strickland's requisite showing of prejudice. See id. at 37-38. Finally, the court denied Blakeney's request for an evidentiary hearing on the ineffective assistance/jury composition claim, on the ground that Blakeney failed to establish one of the six factors in Townsend v. Sain, 372 U.S. 293, 312-13 (1963), a showing necessary to qualify him for such a hearing. See Habeas Corpus Order 38. Thereafter, in its Second Rule 59(e) Order, the court stood by its denial of Blakeney's evidentiary hearing request.

### 2.

On appeal, Blakeney challenges the district court's grounds for rejecting his ineffective assistance/jury composition claim pursuant to Strickland, but he does not specifically address the court's ruling that he failed to demonstrate entitlement to an evidentiary hearing under Townsend. A habeas corpus petitioner is not entitled to an evidentiary hearing in the district court if he "'failed to develop the factual basis of a claim' in state court unless certain statutory requirements are satisfied."

61

Fullwood, 290 F.3d at 681 (quoting 28 U.S.C. § 2254(e)(2)).[22]

Even if § 2254(e)(2) presents no bar to an evidentiary hearing, however, "that does not mean he is entitled to an evidentiary hearing — only that he may be." Id. (internal quotation marks omitted). And, as the district court recognized, petitioner must also establish one of the six factors set forth in Townsend, 372 U.S. at 312-13. Those six factors are:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

Townsend, 372 U.S. at 313. Simply put, Blakeney has not offered us any basis to conclude that the district court abused its discretion in ruling that he failed to satisfy one of the six Townsend factors. Accordingly, we affirm the court's denial of

----

[22] Under 28 U.S.C. § 2254(e)(2), a habeas corpus petitioner, in order to be accorded an evidentiary hearing in the district court, must show that his habeas claim relies on "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or on "a factual predicate that could not have been previously discovered through the exercise of due diligence," and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."

Blakeney's request for an evidentiary hearing on his ineffective assistance/jury composition claim.

## IV.

Pursuant to the foregoing, we affirm the district court.

<u>AFFIRMED</u>

GREGORY, Circuit Judge, concurring in part and dissenting in part:

Blakeney contends that he was prejudiced by trial counsel's failure to interview and present mitigating evidence from several witnesses who were available and willing to testify at the sentencing proceeding.[1] I agree and, therefore, dissent from the majority's denial of relief on Blakeney's claim that his trial counsel rendered ineffective assistance during the sentencing phase of the trial. I concur in the majority's judgment to deny Blakeney relief on his other claims.

Trial counsel's ineffectiveness was prejudicial because their lack of investigation deprived Blakeney of witness testimony that was crucial to his mitigation defense. They did not call Blakeney's wife, five of his six siblings, or members of his community as witnesses. Although trial counsel's

_____

[1] Blakeney also claimed that his counsel rendered ineffective assistance because they failed to provide his expert, Dr. Worthen, with sufficient information to make an appropriate diagnosis. Although it seems clear that trial counsel inadequately prepared Dr. Worthen, and that Dr. Worthen's testimony probably had a prejudicial effect on the jury, I agree with the majority that Blakeney's claim was undermined when his own witness, Dr. Bellard, testified at the MAR hearing that Dr. Worthen could have reached a proper diagnosis with the limited information supplied by counsel. Thus, Blakeney could not demonstrate that counsel's ineffective assistance caused the prejudice that resulted from Dr. Worthen's diagnosis.

64

decision not to call character witnesses is a strategic one to which enormous deference is owed, United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004), we are not obliged to give such deference when, as here, counsel's conduct is unreasonable and unjustifiable. If the Sixth Amendment is to have meaning, we cannot simply elevate counsel's flawed performance to the status of strategy. This is especially so in capital sentencing proceedings.

During the sentencing phase of the trial, Blakeney's trial counsel presented three lay witnesses and one expert, Dr. Mark Worthen. Two of the lay witnesses, correctional officers from the county jail, testified that Blakeney did not commit infractions while in jail. (J.A. 56-60.) The third lay witness, Peggy Blakeney Ratcliff, one of Blakeney's six siblings, (J.A. 143-51) testified that their family was extremely poor and that Mr. Huntley, the victim, and Gracie Blakeney, Blakeney's mother, often drank too much. (J.A. 146-51.) Trial counsel did not seek further testimony from Ms. Ratcliff about Blakeney's background or Mr. Huntley as a step-father.[2] The testimony of the three lay witnesses represented

---

[2] Evidence came in during the MAR hearing that the victim had physically abused Blakeney's mother and engaged in sexually inappropriate behavior with Blakeney's sisters.

only twelve pages of the entire trial transcript.  (J.A. 56-60, 143-51.)  Crow, one of Blakeney's attorneys, testified that he strategically chose to call only Ms. Ratcliff as a witness because he knew her well.[3]  (J.A. 2217.)

Trial counsel stated that they did not want to put Blakeney's wife on the stand for the strategic reason that she would highlight his drug use.  Yet, evidence of Blakeney's drug use was prevalent throughout the record without her testimony.  The drug use was emphasized specifically in Dr. Worthen's report, yet trial counsel thought that the doctor's testimony was the most effective way to present mitigation evidence.

Blakeney's wife could have presented evidence of their chaotic family life.  She testified at the MAR hearing that her oldest daughter, age fourteen, was in a violent relationship with her twenty-one-year-old husband, Aaron.  When Blakeney came to his step-daughter's aid, Aaron pulled a gun on him.[4]  This was not the first time that things became physical in that household, yet Blakeney did not respond violently then or ever.  (J.A. 1646-47.)  This was important testimony to be heard in

---

[3] Crow served as Ms. Ratcliff's counsel three or four years prior to Blakeney's trial.  (J.A. 2217.)

[4] This is exactly what the victim did to Blakeney in the underlying offense.

juxtaposition to Blakeney's prior criminal record and the government's attempt to portray Blakeney as a man prone to violence.

The majority's characterization of the other five siblings' testimony presented at the MAR hearing as cumulative is incorrect. All of Blakeney's siblings were available and willing to be interviewed and provide unique testimony. Claree Blakeney Griffin testified at the MAR hearing and offered a portrait of Blakeney quite different from that painted by the government. She described her brother as a gentle and giving man, testifying that when the father that abandoned all seven children became ill as an elderly man, it was Blakeney who traveled to stay with him and take care of him until "he got better on his feet." (J.A. 1400.) Blakeney cooked, cleaned, and helped his father pay the bills. This was but one example of Blakeney's actions that supported Griffin's testimony that her brother has a "good heart." (J.A. 1402.)

Griffin's testimony was corroborated by another sister, Catherine Taylor. Taylor added her own unique story to help describe why she thought her brother was a good person. When she was having personal problems, Blakeney offered to drive Taylor from North Carolina to Cleveland and then take the bus back. (J.A. 1602-03.) She said that he was always there when she needed him. (Id.) It is mystifying that trial counsel

disregarded the entire family, when the MAR transcript of Taylor's testimony seemed to be especially coherent and believable.

Like his sisters' testimony, Jimmy Blakeney's ("Jimmy") testimony could have helped his brother. Not only could Jimmy have corroborated Blakeney's assertion that he had completed the DART program, but he also had his own unique story demonstrating Blakeney's positive character traits. Jimmy lived next door to the Wilsons, an elderly couple whom Blakeney would take shopping and fishing. Blakeney also did chores and ran errands for the couple without compensation. (J.A. 1630.)

The majority did not explain how it was reasonable for trial counsel to discount five siblings, saying that they could not handle testifying, after meeting only one sibling, who seemed worthy of the stand. (Maj. Op. 43.) The information the family could have provided was vital because his family offered, among other things, an alternative portrayal to contrast the government's image of a man who had thoughtless disregard for the elderly and personal suffering.

The MAR court stated that trial counsel talked to Blakeney's family members and "sized them up" in order to decide who should testify for Blakeney. Counsel met Blakeney's wife and mother and decided they did not have enough "composure" to testify. (Maj. Op. 42.) It is clear that trial counsel based

their decision on the way that these women spoke and their level of education, calling it "composure." In fact, it seems that after trial counsel met these women, they prejudged the rest of Blakeney's large family, deciding that if these women lacked "composure" then no one in his family was worth interviewing.

The majority appears to approve of Crow's stated reason for not calling these family members: "I really had no prior contact with [them] . . . [i]t's hard to make a [really] good decision about something like that, with such short contact." (Maj. Op. 43.) It is hard to believe that the majority was satisfied with this excuse given that Crow's "short contact" with Blakeney's family members was the result of his failure to attempt to meet them. It is not clear whether counsel ignored Blakeney's family because they lacked composure or because Crow "had no prior contact with them," but each excuse is inadequate on its own and indefensible when joined with the other. How can it be reasonable to conclude that a person lacks composure without meeting him or her? Clearly, trial counsel's excuses are unjustifiable.

In finding that trial counsel were reasonable in failing to interview and offer Blakeney's family as witnesses, the MAR court stated:

> Crow thought that defendant's family members were "all good people," but he also knew that none of them were "what you might call leading citizens of the

69

> community." None of defendant's family members held public office; none were members of any profession (e.g., ministers, lawyers, doctors, bankers.) Thus Crow did not call as witnesses at trial all of defendant's brothers and sisters.

(J.A. 2221.) Needless to say, one need not be a minister, lawyer, doctor, or banker to be a respected or leading member of one's community. All of the people who testified for Blakeney at the MAR hearing were hardworking members of the community and, with the exception of one, none had criminal records. Trial counsel prejudged these potential witnesses and discounted them because they did not have fancy letters after their names. The MAR court, district court, and majority called this strained reasoning "strategy," and concluded that it satisfied Strickland. I disagree.

Even if trial counsel did not believe that Blakeney's family members were "upstanding citizens" worthy of the stand, had trial counsel interviewed them they would have led to witnesses such as Union County Deputy Sheriff George Curtis Parker. Parker testified at the MAR hearing that he had known Blakeney all of his life, that the incident was "out of character" for Blakeney, and that he would have testified at the sentencing proceeding. (J.A. 1375-88.) Parker was a law enforcement officer with the Sheriff's Office for seventeen years before retiring. His testimony certainly would have been persuasive at the sentencing proceeding, because unlike the

70

prison guards trial counsel presented at sentencing, Parker knew Blakeney's family intimately and had known Blakeney personally since he was a boy. Given the nature of Parker's close relationship with the family, a minimal amount of investigation would have led trial counsel to him. In fact, most of the information that would have aided in Blakeney's mitigation defense could have been easily obtained.

The majority and the courts before it found Blakeney's trial counsel effective because they accepted Crow's decision to place all of the responsibility for mitigation investigation on Blakeney's family: "I guess the bottom line, I talked to those people that came forward and I urged them—and I would have talked to anybody else, any other family member that had-had they brought along with them. It's their family." (J.A. 2220.) One must appreciate Crow's honesty. He admitted that he allowed his mitigation investigation to begin and end with the efforts of Blakeney's family. He admitted that he was willing to talk to anyone provided they came to him, but forged no independent investigation despite the fact that such investigation could have revealed defense theories and character witnesses. This type of responsibility shifting has been rejected as ineffective in relevant case law.

In Gray, this Court did not allow trial counsel to rely on the petitioner's failure to aid in his own defense. 529 F.3d at

71

225-26, 230 (finding that trial counsel was not allowed to rely on defendant's instruction "not to spend another f'ing penny on this trial" because "he didn't need a psychiatrist" and "[t]here was nothing wrong with him."). In Rompilla, the defendant told his trial counsel that his background was unexceptional, yet the Supreme Court did not allow trial counsel to end their investigation there. 545 U.S. at 381. Investigation is as important to a proper defense as oral argument in court, and it is an especially essential element in the defense of a capital case. It is ironic that Blakeney's counsel shifted responsibility for the investigation onto the same family that they determined lacked composure. Even a cursory evaluation of trial counsel's performance reveals that it fell well below professional norms and greatly prejudiced Blakeney.

The majority stated that the MAR court drew favorable comparisons to three of our decisions, implying that the MAR court's analysis was sound when it was not. (Maj. Op. 46.) Unlike in Tucker v. Ozmint, this Court cannot conclude that the "psychologist ... gave the jury a full picture of [the defendant's] ... disturbing social history." 350 F.3d at 441-42. Unlike the doctor in Tucker, Dr. Worthen could not have presented a full picture of Blakeney to the jury, because, as acknowledged, he lacked the complete picture. In this case,

72

Blakeney's family could have provided the full picture, but no one interviewed them to obtain it.

The MAR court and the majority correctly characterized Bacon v. Lee, where we stated:

> "[C]ounsel could reasonably have concluded, based on their earlier investigation, that the evidence they had developed . . . would give the jury an accurate picture of [the petitioner's] . . . personality and that further investigation into . . . [the petitioner's] background would not be fruitful."

225 F.3d at 481. In contrast, here further investigation would certainly have been fruitful in developing Blakeney's mitigation defense. Had trial counsel done even minimal investigation, they would have discovered that Blakeney's family could have presented valuable information to the jury. This information would have supplemented the doctor's testimony with mitigating evidence relating to Blakeney's benevolent conduct, kind heart, and good character.

It is unclear how Byram is analogous, since this Court stated, "Unlike in Wiggins, . . . counsel here spent considerable time developing a picture of [petitioner's] . . . life."[5] 339 F.3d at 210. The record reflects that trial counsel

---

[5] In Byram, we held that the petitioner had not shown that his trial counsel's performance fell below an objective standard of reasonableness. Id. at 209. One member of Byram's defense team logged 623.5 hours of pre-trial preparation while the other member met with Byram at least thirty times. Id. at 210. Blakeney's trial counsel logged a total of 506.47 hours working
(Continued)

did not spend a considerable amount of time developing a picture of Blakeney's life. The cases cited by the MAR court, and relied upon by the majority, are inapposite to the case at bar.

The MAR court proffered, and the majority tacitly accepts, some troubling reasons to justify its finding that trial counsel was not ineffective in failing to interview Blakeney's family. The court's first stated reason for concluding that trial counsel's failure to interview and call Blakeney's family as character witnesses was not a "source of prejudice" was that "several of the witnesses demonstrated an obvious bias in favor of defendant based on their past close familial relationship to him." (Maj. Op. 47.) The MAR court seems to suggest that courts must discredit the testimony of family members who love the defendant. Is "obvious bias . . . based on . . . close familial

---

on Blakeney's entire case. (J.A. 2167-69.) Most of trial counsel Crow's hours were in court. Despite the fact that one member of Byram's defense team logged more hours in pre-trial preparation than the total of both of Blakeney's defense attorneys during the entire case, this is not dispositive as we did not base our decision in Byram merely on the number of hours logged by the attorneys. Byram's defense team hired a forensic psychologist and a forensic psychiatrist. Id. Byram's defense team carefully analyzed the findings of the doctors and decided not to present the testimony of either, which was a strategic decision based on the potentially prejudicial findings of the doctors. Id. Blakeney could only wish that his trial counsel had understood the potentially prejudicial effect of Dr. Worthen's diagnosis and supplemented it with mitigation evidence.

74

relationship" not just a convoluted way of describing love?  If this Court were to adopt the logic of the MAR court, then we would have to disregard the testimony of all family members even when, as here, they possess valuable mitigation evidence.

The court went on to state that "several of the witnesses based their opinion that defendant was a man of 'good character' on factors not normally considered to be indicia of good character." (Id.)  Yet as shown above, his siblings offered specific conduct as evidence to support their assertions that Blakeney had a kind heart and was a good person.  Additionally, the court stated that "considerable evidence of record shows that defendant is not a man of good character (e.g., the evidence of his history of substance abuse and his commission of armed robbery, larceny, assault, arson, and murder)."  (Id.) This is an especially troubling assertion.  Under the court's standard, no person with a history of criminal convictions and substance abuse could be considered a good person no matter how many years he was sober or how many good deeds he had done. Under the court's standard, there would be no need to have character witnesses at all because if a man were convicted of a crime, he would be, per se, a man of bad character.

Most surprisingly, the court said, "[D]efendant did not introduce any significant evidence proving that he is in fact a man of good character."  (Id.)  However, Blakeney presented

75

fourteen character witnesses, many of whom said wonderful and unique things about him and supported their testimony with specific evidence. By the MAR court's standard, it seems there is nothing Blakeney could have presented to demonstrate good character.

Finally, the MAR court justified its finding that Blakeney was not prejudiced by his counsel's deficient performance by stating: "[E]vidence of record shows that after defendant completed the DART program while serving five years confinement and after he was placed on probation, defendant disregarded the lessons he should have learned and returned to the costly and debilitating practice of using illegal drugs." (Id.) Blakeney, however, argues that he was prejudiced by Dr. Worthen's statements doubting that he had completed the DART program because the prosecutor exploited it in closing argument to cast doubt on other aspects of his life. The MAR court's conclusion that Blakeney was not prejudiced by the DART inference because he had relapsed is unpersuasive. Blakeney never claimed he was drug-free; he merely attempted to demonstrate that he had completed the DART program in an effort to rid himself of drugs. Although he was telling the truth about an important aspect of his mitigation defense, he was impugned at the sentencing proceeding as being a liar. This was clearly prejudicial.

Blakeney's trial counsel's failure to investigate is indefensible and led to a meager mitigation defense: Dr. Worthen's poorly informed diagnosis could not mitigate the evidence against Blakeney, his sister's testimony was but a small piece of the full story his family could have provided, and the two correctional officers' testimony paled in comparison to that of the Deputy Sheriff. Trial counsel admitted that the evidence on guilt was stacked against Blakeney, which only increased the necessity to develop the mitigation defense that was readily available if they had properly investigated the case, assessed the witnesses, and presented the evidence at the sentencing phase of the trial. Blakeney was practically left defenseless at the sentencing proceeding. In this matter of life or death, the Sixth Amendment certainly requires more of counsel. Thus, I dissent.